FILED

2015 Sep-28  PM 04:10
U.S. DISTRICT COURT
N.D. OF ALABAMA



## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | |
|---|---|
| **GRAHAM & COMPANY, LLC and** ) | |
| **BP GRAHAM, LLC,** ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) | |
| **v.** ) | **Civil Action No.: 2:14-cv-02148** |
| ) | |
| **LIBERTY MUTUAL FIRE** ) | |
| **INSURANCE COMPANY,** ) | |
| ) | |
| **Defendant.** ) | |

## LIBERTY'S RESPONSE TO PLAINTIFFS' MOTION TO COMPEL "BAD FAITH DISCOVERY" AND MOTION FOR PROTECTIVE ORDER

Liberty Mutual Fire Insurance Company ("Liberty"), by and through undersigned counsel, hereby files this Response to Plaintiffs Graham & Company, LLC and BP Graham, LLC's (collectively "Graham") Motion to Compel Bad Faith Discovery (Doc. 38) (the "Motion to Compel") and Motion for Protective Order.

### INTRODUCTION

The bad faith discovery Graham seeks to compel is overreaching and burdensome. Graham has made no efforts to narrow the scope of its overreaching requests, and responding to Graham's discovery would require Liberty (companywide) to review hundreds of thousands of documents and produce tens of thousands of claims files that have absolutely nothing to do with this lawsuit—all for a loss that has already been <u>paid</u> by Graham's insurance broker, Cobbs Allen &

Hall, Inc. ("Cobbs Allen"), and Cobbs Allen's malpractice insurer. (*See* Doc. 26). Liberty respectfully requests that this Court deny Graham's Motion to Compel and award Liberty the substantial fees that it has incurred preparing this opposition.

While you wouldn't know from the scope of Graham's bad faith discovery, this lawsuit involves a straight forward insurance coverage dispute related to an April 25, 2014 electrical equipment loss at a commercial property formerly owned by Graham (the "550 Water Street loss").  It is undisputed that the 550 Water Street property was not a location covered under Graham's equipment breakdown policy with Liberty (the "Liberty Policy") and that Cobbs Allen wholly neglected to obtain equipment breakdown coverage for the 550 Water Street property with Liberty or any other insurer since Cobbs Allen took over Graham's account in 2012.  In this lawsuit, Graham—*really Cobbs Allen and its malpractice insurer*—seeks coverage for the 550 Water Street loss either by reforming the Liberty Policy to retroactively make the 550 Water Street property a covered location under the Liberty Policy as Cobbs Allen allegedly intended or, alternatively, through the Liberty Policy's "errors and omissions clause," which generally provides coverage for certain specific errors and omissions in the scheduling of covered locations that are not present here.  Graham—who again has been paid for the loss giving rise to the alleged breach and has purported to assign its claims to Cobbs Allen in

connection with this payment—also accuses Liberty of breaching the very contract it now seeks to reform in bad faith, if that is even possible.

Relying largely on this purported bad faith claim, in its Motion to Compel, Graham seeks, among other things, the following burdensome and overreaching discovery:

- Detailed information about <u>every lawsuit</u> arising out of <u>any commercial property claim</u> where Liberty (<u>companywide</u>)[1] has been sued for bad faith and/or any <u>other tortious conduct</u> <u>nationwide</u>[2] <u>from 2005 to present</u> (Interrogatory No. 9);

- The production of <u>every complaint</u> and <u>complete claims file</u> from <u>every lawsuit</u> arising out of <u>any commercial property claim</u> where Liberty (<u>companywide</u>) has been sued for bad faith and/or <u>any other tortious conduct</u> <u>nationwide</u> <u>from 2005 to present</u> (Request Nos. 16 and 47);

- The production of <u>every claims file</u> handled by Dwight Hinton (the adjustor that handled Graham's claim) and <u>every claims file</u> involving the subject errors and omissions clause and similar clauses <u>nationwide from 2005 to present</u> (Request Nos. 18 and 47);

- The production of <u>all correspondence</u> with <u>any State Department of Insurance and/or Commissioner</u> in any way involving alleged bad faith and/or <u>any other tortious conduct</u> in the adjustment and payment of <u>any claim</u> for <u>any commercial property claim</u> by Liberty <u>nationwide</u> <u>from 2005 to present.</u> (Request No. 19); and

- A complete list of <u>all "claims"</u> asserted against Liberty <u>nationwide</u> for bad faith and/or <u>any other tortious conduct</u> "in connection with

---

[1] Unlike some other requests directed to Liberty only, Interrogatory No. 9 and Requests 16 and 47 seek information from "Liberty (companywide)."

[2] <u>None</u> of Graham's bad faith discovery requests purports to limit their geographical scope.  Liberty assumes for purposes of this opposition that Graham is confining its requests to claims under policies issued in the U.S., but Graham's requests could be read to reach worldwide.

Liberty's handling, processing, and adjusting of claims," <u>ever</u> (Request No. 43).

## LIBERTY'S PREVIOUS PRODUCTION

Before addressing the individual requests in Graham's Motion to Compel, it is important to point out the documents and information that Liberty has already produced (or agreed to produce) in this lawsuit. Prior to the filing of Graham's Motion to Compel, Liberty has, subject to applicable privileges, produced (or agreed to produce) the following categories of documents, all of which conceivably have some tangential relationship to this lawsuit:

- A certified copy of the Liberty Policy;

- The complete claims file for the subject claim;

- The complete underwriting file for the Liberty Policy;

- Pertinent claims guidelines and procedures for equipment breakdown claims in effect at the time of the subject claim;

- Pertinent underwriting guidelines and procedures for monoline equipment breakdown policies in effect at the time the Liberty Policy was underwritten; and

- Pertinent equipment breakdown training materials that may have been provided to brokers at or around the time the Liberty Policy was underwritten.[3]

---

[3] Liberty has agreed to produce applicable claims and underwriting guidelines and procedures and applicable equipment breakdown training materials at a mutually agreeable time when Graham supplements its production to Liberty's first-filed discovery requests. Graham is currently working under a 20 day extension in which to supplement its own production, at which time Liberty will likewise supplement its production to include these materials.

## EFFORTS TO RESOLVE DISCOVERY DISPUTE
## WITHOUT COURT INTERVENTION

Graham sent a Rule 37 Letter to Liberty on August 10, 2015 asserting that Liberty's responses to certain interrogatories and requests for production were inadequate (Doc. 38-2). Prior to the agreed upon date for Liberty to respond to this letter, counsel for Graham requested a four month extension on all deadlines in the case in order to continue to pursue its commercial property insurer for coverage for the 550 Water Street loss. Liberty agreed to and joined in this requested extension (Doc. 36), and asked for a short extension of its own to respond to Graham's Rule 37 letter. Graham agreed to this short extension, but asked that Liberty identify any categories of documents that it did not intend to produce, to which Liberty responded that it did not intend to produce the requested claims files for every lawsuit involving allegations of bad faith against Liberty (companywide), *i.e.*, that Liberty did not intend to produce the documents requested in Request Nos. 16 and 47. Prior to the agreed upon extension for Liberty to respond to Graham's Rule 37 letter, Graham filed this Motion to Compel seeking to compel the unrelated claims files in these two requests as well as practically every other request identified in Graham's Rule 37 letter.

## RELEVANT STANDARDS GOVERNING DISCOVERY

Rule 26(b)(1) of the *Federal Rules of Civil Procedure* allows parties to "obtain discovery regarding any nonprivileged matter that is relevant to any party's

claim or defense." Fed. R. Civ. P. 26(b)(1). "[D]iscovery, like all matters of procedure, has ultimate and necessary boundaries. Discovery of matter not reasonably calculated to lead to the discovery of admissible evidence is not within the scope of Rule 26(b)(1)." *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351-52 (1978); *E.E.O.C. v. Southern Haulers, LLC, No.* 11-00564-N, 2012 WL 5897659, at *1 (S.D. Ala. 2012) ("the scope of discovery is not without limits, and the Supreme Court has recognized that 'discovery, like all matters of procedure has ultimate and necessary boundaries.'"). Indeed, courts have long held that "discovery should be tailored to the issues involved in the particular case." *Washington v. Brown & Williamson Tobacco Corp.*, 959 F.2d 1566, 1570 (11th Cir. 1992).

In addition to the limitations on discovery inherent in the text of Rule 26(b)(1), discovery is further limited by the provisions of Rule 26(b)(2)(C), which grants courts authority to restrict discovery if "the discovery sought is unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive" or "the burden or expense of the proposed discovery outweighs its likely benefit, considering the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the action, and the importance of the discovery in resolving the issues." Fed. R. Civ. P. 26(b)(2)(C)(i), (iii).  Rule 26(c) similarly provides that

a court may "issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense." Fed. R. Civ. P. 26(c).

When viewed in light of the principles discussed above, the requests at issue clearly exceed the bounds of permissible discovery, and Graham's Motion to Compel should be denied.

## **ARGUMENT**

### I.   **"Bad Faith Discovery Requests" (Interrogatory No. 9 and Request Nos. 16, 19, 43, and 47)**

The "bad faith discovery" sought by Graham is, in a word, overreaching.

Interrogatory No. 9 seeks detailed information about <u>every lawsuit</u> arising out of <u>any commercial property claim</u> where Liberty (<u>companywide</u>) has been sued for bad faith and/or <u>any other tortious conduct</u> <u>nationwide</u> <u>from 2005 to present.</u>

Request Nos. 16 and 47 seek the production of <u>every complaint</u> <u>and complete claims file</u> for <u>every lawsuit</u> arising out of <u>any commercial property claim</u> where Liberty (<u>companywide</u>) has been sued for bad faith and/or <u>any other tortious conduct</u> <u>nationwide</u> <u>from 2005 to present.</u>

Request No. 19 seeks the production of <u>all correspondence</u> with <u>any State Department of Insurance and/or Commissioner</u> in any way involving alleged bad faith and/or <u>any other tortious conduct</u> in the adjustment and payment of <u>any claim</u> for <u>any commercial property claim</u> by Liberty <u>nationwide</u> <u>from 2005 to present.</u>

Request No. 43 seeks the production of a complete list of <u>all "claims"</u> (whatever this means) asserted against Liberty <u>nationwide</u> for bad faith and/or <u>any other tortious conduct</u> "in connection with Liberty's handling, processing, and adjusting of claims," <u>ever</u>.

So, by way of example, Graham would have Liberty provide detailed information about and produce the complaint and complete claims files for every commercial Katrina claim for every Liberty Mutual company where those claims resulted in a lawsuit for bad faith or some other unidentified tort.  Graham would also have Liberty sift through every claims file ever handled by Liberty so that it can produce a list of every instance where Liberty has ever even been accused of, but not sued for, bad faith or some other unidentified tort.

### A.  The Requested "Bad Faith Discovery" Is Overly Broad and Not Relevant to Graham's Claims.

No credible argument can be made that the burdensome bad faith discovery requested by Graham is relevant to Graham's claims in this lawsuit.  Graham does not even attempt to argue that the bad faith discovery is somehow relevant to Graham's claims for breach of contract, reformation, or negligent underwriting.  Graham instead argues that it is entitled to the bad faith discovery because Graham's bad faith claim (and corresponding request for punitive damages) requires Graham to show that Liberty intentionally or knowingly failed to determine a lawful basis for denying Graham's claim and that that this knowledge

or intent can somehow be inferred from other claims and other insureds where bad faith and/or other unidentified tortious conduct was alleged against Liberty (companywide).

Setting aside the merit (or lack thereof) of Graham's bad faith claim in this case, which is discussed more fully below, simply alleging bad faith does not open the door to the burdensome discovery Graham seeks.  Indeed, the intent/knowledge component of Graham's purported bad faith claim involves whether Liberty, in adjusting <u>Graham's claim</u>, intentionally or knowingly failed to determine whether there was a legitimate or arguable reason to refuse to pay <u>Graham's claim</u>.  Simply put, what Liberty (or other Liberty Mutual entities) did or did not do in connection with other claims made by other insureds has absolutely no bearing on Graham's purported bad faith claim here.

The majority of courts to address the discoverability of records and information related to other insureds have denied these type requests, even where the requests were much more narrowly tailored than here, either on the ground that the requests would not lead to the discovery of relevant evidence, or on the ground that any possible relevance of such information is so clearly outweighed by the burden of production. *See Graham v. Progressive Direct Ins. Co.*, No. CIV.A. 09-969, 2010 WL 3092684, at *1 (W.D. Pa. Aug. 6, 2010) ("[T]he majority of the opinions addressing this issue disfavor the discovery of <u>similar</u> claims evidence in

bad faith cases.") (emphasis added); *N. River Ins. Co. v. Mayor & City Council of Baltimore*, 680 A.2d 480, 497 (Md. App. 1996) ("The numerical majority of the cases deny any discovery of the records of other insureds").  And, research has not produced a single decision that has come close to allowing the burdensome and overreaching bad faith discovery requested by Graham here, certainly not one in Alabama or within the Eleventh Circuit.

*St. Paul Reinsurance Co., Ltd. v. Commercial Fin. Corp.*, 197 F.R.D. 620 (N.D. Iowa 2000) in instructive. In *St. Paul*, three insurance companies sought a declaratory judgment rescinding an insurance policy based upon the insured's alleged fraudulent suppression of facts. *Id.* at 623. The insured filed a counterclaim, asserting that the insurers acted in bad faith in denying its claim for coverage under the subject policy. *Id.* at 623-24. As here, the insured sought discovery of its own claims file as well as discovery concerning other prior bad faith claims against the insurers (though much narrower than that requested here by Graham). *Id.* at 624.

The insurers objected on grounds of relevance, undue burden, and privilege, among others, and opposed the insured's motion to compel on the basis that information related to past bad faith claims would have no bearing on the underlying coverage dispute. The Court agreed, stating: "[i]n these circumstances, permitting [the insured] to discover information about other bad faith claims

against the [insurers] would be to authorize a 'fishing expedition' with little or no relevance to the merits of the bad faith claim as framed by the party asserting it. The proper question as to the 'knowledge' element of [the insured's] bad faith claim in this case is whether the [insurers] knew or had reason to know that their denial … was without a reasonable basis, that is, whether it was unreasonable to believe that a material non-disclosure was a ground for denying coverage." *Id.* at 644. Thus, the Court found that discovery related to other claims and other insureds was wholly irrelevant to whether the insurers had a reasonable basis for denying coverage for the insured's specific claim in that case. *Id.* Further, and as discussed more fully below, the Court went on to find that the discovery should also not be allowed because the "discovery of information regarding such claims would be unduly burdensome in relation to the likely benefits." *Id.* at 644–45.

*Santer v. Teachers Ins. & Annuity Ass'n*, No. CIV.A. 06-CV-1863, 2008 WL 755774 (E.D. Pa. Mar. 18, 2008) is also instructive.  In *Santer*, the insured plaintiff sued her insurer for bad faith failure to make disability payments in connection with a disorder she contracted while a professor at UAB. *Id.* at *1. The insured plaintiff similarly sought bad faith discovery related to other insureds and other claims (again, much narrower than that sought by Graham here), and the insurer raised similar objections based upon relevancy and undue burden. *Id.* As in *St. Paul*, the Court denied the insured's bad faith discovery requests and found that

11

"[l]imiting discovery to the practices applied to the individual plaintiff is the preferable approach, as the 'issue in a bad faith case is whether the insurer acted recklessly or with ill will towards the plaintiff in a *particular* case, not whether the defendants' business practices were *generally* reasonable." *Id.* at *3 (emphasis added).

Similar decisions have been reached by numerous other state and federal courts. *See e.g.*, *Moses v. State Farm Mut. Auto. Ins. Co.*, 104 F.R.D. 55, 57 (N.D. Ga. 1984) (denying motion to compel discovery of similar claims denials to support bad faith claim and noting that "[t]he issues in this case are limited to Defendant's conduct regarding Plaintiff's claim for insurance benefits and to the adequacy of Defendant's reasons for that conduct. Defendant's conduct regarding the insurance claims of others is of no consequence to this case."); *Stephens v. State Farm Fire & Cas. Co.*, No 1:14-cv-160, 2015 WL 1638516 (M.D. Pa. Apr. 13, 2015) (denying motion to compel discovery of other lawsuits and claims and noting that "courts have frequently rejected sweeping demands for wholesale disclosure of other litigation over the span of many years."); *N. River Ins. Co. v. Greater N.Y. Mut. Ins. Co.*, 872 F. Supp. 1411, 1412 (E.D. Pa. 1995) (denying motion to compel answer to interrogatory regarding whether insurer had been party to other bad faith actions over seven years, characterizing the attempted discovery as a "fishing expedition," and stating "[t]hese prior bad faith cases, if any, will

necessarily involve totally different facts and circumstances from those present here. Such information not only is highly unlikely to have any relevance to whether or not GNY acted in bad faith in the McIlhenny lawsuit but does not even "appear reasonably calculated to lead to the discovery of admissible evidence.") (emphasis added); *First Fidelity Bancorporation v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA.*, 1992 WL 55742 (E.D. Pa. 1992) ("[T]he scope of this discovery request [for other claims files] far exceeds what would be reasonably admissible under [the Federal Rules of Evidence].").[4]

As recognized in these well-reasoned decisions, Liberty's conduct in connection with the claims of others insureds has absolutely nothing to do with Graham's claims against Liberty in this case. Further, there are no allegations in this lawsuit that Liberty somehow engaged in a pattern and practice of denying similar claims in bad faith where its insureds' brokers neglected to obtain the requested coverage. Simply put, the issue for Graham's purported bad faith claim is whether Liberty intentionally or knowingly failed to determine whether there

---

[4] These out-of-state decisions are consistent with principles recognized by Alabama state and federal courts in similar circumstances. *See e.g.*, *Horton Homes, Inc. v. Bandy*, No. 2:07CV506MEF, 2008 WL 3843573, at *6 (M.D. Ala. Aug. 14, 2008) (denying motion to compel and granting motion for protective order because party's discovery request was based on "mere speculation" and was not reasonably related to a claim or defense in the case); *Ex parte Orkin, Inc.*, 960 So. 2d 635, 642 (Ala. 2006) (reversing trial court which allowed discovery on customer files from 1978 through 2002 because "such a broad request should not be sanctioned on the unsubstantiated hypothesis that a search of records related to nonparties might uncover fact patterns similar to [plaintiffs'] own"). Similarly, Alabama state and federal courts recognize that even where limited pattern and practice discovery would be allowed, such as in cases of fraud, "collateral acts evidencing a pattern or practice" must be "substantially of the same character [and] contemporaneous in point of time." *See Morris v. Laster*, 821 So. 2d 923, 935 (Ala. 2001) (emphasis added).

was a legitimate or arguable reason to refuse to pay Graham's claim, not Liberty's general business practices in adjusting all other claims for other insureds.

Even the cases cited by Graham do not support Graham's request for the broad discovery that it seeks. In support of its argument on discoverability, Graham relies on a number of distinguishable decisions that allowed production of limited information related to other factually similar and logically related claims. For example, in *Broadway Park, LLC v. Hartford Cas. Ins. Co.*, 2006 WL 2321410 (W.D. Okla. 2006), the Court allowed limited discovery related to the same hailstorm that damaged similar properties within a one mile radius of the property in dispute on the basis that the discovery was "narrowly tailored both in time in location." *Id.* at *2. The Court, however, denied discovery on a single unrelated claims file because it was a "separate claim involving a different cause of loss, a year after the claim at issue, and under a completely different set of circumstances." *Id.* at *2. Similarly, in *Southard v. State Farm Fire & Cas. Co.*, 2012 WL 2191651 (S.D. Ga. 2012), a lawsuit involving an alleged bad faith denial of a mold claim, the Court specifically stated it was only allowing discovery of four other mold cases similar to those involved in the subject claim because the request "extends to just the four [mold cases] in question, not all prior bad-faith cases or some similar open-ended request." *Id.* at *4. In a lengthy footnote, the Court also discussed how most courts have actually denied requests similar to

Graham's on grounds of relevance and undue burden. *Id.* at *2 n.6.  In fact, research has not produced a single decision in any jurisdiction that allowed an insured to obtain claims files not specifically related to the insured's claim at issue in the suit and narrowly tailored in both time and scope, nor has researched produced a decision from Alabama or the Eleventh Circuit that permitted the production of other claims files at all.[5]

At the absolute most, then, under the cases cited by Graham, Graham would only be entitled to specific information related to specific claims that are factually similar and have a logical nexus to Graham's claim for equipment breakdown coverage in this case, that is, for example, other claims where Liberty reviewed coverage under this same provision where the insureds' broker neglected to obtain equipment breakdown coverage and such neglect, if at all, was through an error in the reporting of values.

---

[5] The other cases cited by Graham are similarly readily distinguishable. *See e.g.*, *Ex parte O'neal*, 713 So. 2d 956 (Ala. 1998) (allowing only limited identifying information of other bad faith lawsuits in Alabama for limited time period); *Kirschenman v. Auto-Owners Ins.*, 280 F.R.D. 474 (D.S.D. 2012) (allowing limited discovery only after insurer voluntarily agreed to produce information on narrow set of other weather-related claims in South Dakota); *Ex parte Finkbohner*, 682 So. 2d 409 (Ala. 1996) (allowing only limited identifying information of other bad faith lawsuits in Alabama for limited time period, and *denying* insured's request for all bad faith claims because of undue burden in case where insurer); *Grange Mut. Ins. Co. v. Trude*, 151 S.W.3d 803 (Ky. 2004) (bifurcating bad faith discovery and holding all bad faith discovery in abeyance pending outcome of personal injury claim, then allowing limited discovery of list of other bad faith lawsuits, under Kentucky Rules of Civil Procedure); *Parkdale America, LLC v. Travelers Cas. & Sur. Co. of America, Inc.*, 2007 WL 3237720 (W.D.N.C. 2007) (allowing only limited identifying information of lawsuits based on same coverage endorsement at issue in action, for limited period of time); *Saldi v. Paul Revere Life Ins. Co.*, 224 F.R.D. 169 (E.D. Pa. 2004) (allowing discovery on practices and procedures of insurer in lawsuit alleging nationwide practice of pretextual denials to boost corporate profitability); *Pugh v. Southern Life & Health Ins. Co.*, 544 So. 2d 143 (Ala. 1988) (allowing discovery on fraud related data in fraud case which was limited to Alabama during last five years).

As noted above, this lawsuit involves a straight forward and very specific insurance coverage question involving the application of a very specific monoline equipment breakdown "errors and omissions clause" to very specific facts.  To be exact, the question is whether this specific errors and omissions clause somehow provides coverage where Cobbs Allen neglected to obtain equipment breakdown coverage for the 550 Water Street property with Liberty or any other insurer since at least 2012 and where Cobbs Allen's neglect in obtaining coverage (allegedly with Liberty as opposed to some other insurer) was an error in the reporting of values, which is expressly excluded from the errors and omissions clause.  The bad faith discovery requested by Graham—which includes, among other things, the production of all complaints and complete claims files for every lawsuit arising out of any commercial property claim where Liberty (companywide) has been sued for bad faith or any other tortious conduct nationwide from 2005 to present and a complete list of all "*claims*" ever asserted against Liberty nationwide for bad faith or other tortious conduct "in connection with Liberty's handling, processing, and adjusting of claims"—cannot possibly be said to be relevant to the specific equipment breakdown claim under a very specific policy provision involving very specific circumstances in this case.

Lastly, the United States Supreme Court has made it absolutely clear that dissimilar acts independent from the claimed wrong—like those requested by

Graham—may <u>not</u> serve as the basis for a punitive damages award. *See also State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 422, (2003) ("A defendant's dissimilar acts, independent from the acts upon which liability was premised, may not serve as the basis for punitive damages" and "nor, as a general rule, does a State have a legitimate concern in imposing punitive damages to punish a defendant for unlawful acts committed outside of the State's jurisdiction."). As a result, Graham's punitive damages demand similarly does not open the door for the burdensome discovery that it seeks.

In sum, Graham has offered absolutely no support for allowing the burdensome and overreaching bad faith discovery it has requested from Liberty. This Court should deny Graham's Motion to Compel on the basis that information sought is overbroad and wholly unrelated to Graham's claims in this lawsuit, and should enter an Order protecting Liberty from this burdensome discovery.

**B.     The Burden and Expense of Responding to Graham's Bad Faith Discovery Far Outweighs Any Potential, Unlikely Benefit to Graham and Would Impose Undue Burden on Liberty**

Assuming arguendo that Graham's bad faith discovery requests relating to decade old lawsuits and claims files involving entirely different torts, entirely different policies, entirely different provisions, entirely different states, and entirely different circumstances were somehow relevant to Graham's claims in this case—they unequivocally are not—the burden and expense of responding to such

requests would far outweigh any potential, unlikely benefit, and would impose an enormous undue burden on Liberty. *See* Fed. R. Civ. P. 26(b)(2)(C)(iii); Fed. R. Civ. P. 26(c)(1).

As an initial matter, "[i]f the sought-after documents are not relevant nor calculated to lead to the discovery of admissible evidence, then any burden whatsoever imposed upon [a person] would be by definition 'undue.'" *OptiStreams, Inc. v. Gahan*, No. CVF-05-0117REC SMS, 2006 WL 829113, at *12 (E.D. Cal. Mar. 28, 2006) (quotations and citations omitted) (emphasis added).

Moreover, even when a party seeks information that may be relevant, the Court should not permit such discovery if the party resisting discovery submits evidence establishing that responding to discovery would be unduly burdensome, or if the burden or expense of the proposed discovery outweighs its likely benefit. *See Coker v. Duke & Co.*, 177 F.R.D. 682, 686 (M.D. Ala. 1998). The Eleventh Circuit and Alabama district courts have routinely rejected attempts by parties to obtain discovery that would impose an undue burden on the party opposing the discovery, particularly as here where the possible benefit of that discovery is so unlikely. *See e.g., Goodman v. Georgia Sw.*, 147 F. App'x 888, 889-90 (11th Cir. 2005) (affirming district court's denial of request by plaintiff for defendants to produce all documents dating back 15 years including grievances and complaints); *Britt v. U S A Truck, Inc.*, No. CIVA2:06-CV-868-ID, 2007 WL 4395578, at *2

(M.D. Ala. Dec. 11, 2007) (denying motion to compel on grounds that plaintiff's request was unduly burdensome where it would require party to review tens of thousands of documents and that the burdensomeness of responding to the request outweighed plaintiff's need). *See also Palma v. Metro PCS Wireless, Inc.*, 18 F. Supp. 3d 1346, 1348 (M.D. Fla. 2014) (denying motion to compel where discovery was "too broad and hinge[d] on the hope of finding something—anything—relevant to [the] litigation"); *Upsher-Smith Labs., Inc. v. Mylan Labs., Inc.*, 944 F. Supp. 1411, 1445 (D. Minn. 1996) (denying motion to compel request for every contract entered into between party and its suppliers where compliance would "impose an inordinate and expensive burden for information marginally relevant at most.").

As set forth in detail below, the burden and expense of responding to Graham's overreaching bad faith discovery here would far outweigh any potential, unlikely benefit, and would impose an enormous undue burden on Liberty.

In Interrogatory No. 9, Graham seeks detailed information about every lawsuit arising out of any commercial property claim where Liberty (companywide) has been sued for bad faith or any "other tortious conduct" nationwide from 2005 to present. Request Nos. 16 and 47 seek the production of every complaint and complete claims file from every lawsuit arising out of any

commercial property claim where Liberty (companywide) has been sued for bad faith or any "other tortious conduct" nationwide from 2005 to present.

Liberty Mutual does not maintain lawsuits and claim files on the basis of the criteria specified Graham in its bad faith discovery requests, and there is no central filing system or location designated for lawsuits and claims files meeting the criteria specified by the Plaintiffs' discovery requests. (Exhibit 1, Chamberlin Declaration, ¶ 7).  While computer generated reports can be run to identify all lawsuits served on Liberty Mutual entities since 2007, the year Liberty Mutual first contracted with Corporate Service Company to track litigation and service of process on Liberty Mutual entities, a manual review of each individual lawsuit would have to be done to determine those lawsuits that satisfy the criteria specified in the Plaintiffs' bad faith discovery requests. (*Id*. at ¶ 8).

According to a recent report run by Corporate Service Company, 102,997 lawsuits have been served on Liberty Mutual entities since 2007. (*Id*. at ¶ 9). Presumably, there would be at least as many claims files as lawsuits filed during this period. (*Id*.).  Based on currently available information, Liberty Mutual has no way of determining the exact number of lawsuits filed against Liberty Mutual entities or the number of corresponding claims files prior to that time. (*Id*.).

Conservatively, it would require an average of 30 minutes to pull each lawsuit to determine whether the lawsuit met the criteria specified in the Plaintiffs'

discovery requests. (*Id*. at ¶ 10).   Once Liberty Mutual was able to identify the lawsuits meeting the criteria specified in the Plaintiffs' discovery requests, conservatively, it would take another 1 hour to locate and record the specific information for each lawsuit requested by the Plaintiffs. (*Id*.).   This excludes locating and recording the "the present status or disposition of the lawsuit" and "the name and address of each person or entity having possession, custody or control of any records relating to such lawsuit," which would take even longer. (*Id*.).

Liberty Mutual would have to then locate, pull, and review the claims file(s) for each lawsuit meeting the criteria specified in the Plaintiffs' discovery requests, which would take considerably longer.  (*Id*. at ¶ 11).   The claims files which would need to be located and reviewed were supervised from offices located throughout the United States. (*Id*. at ¶ 12).   Due to the time period for which the Plaintiffs seek the requested information, a significant portion of the files are closed and may be in "off-site" storage. (*Id*.).   These closed files would not be located in a single off-site storage facility, but at hundreds off-site storage facilities throughout the United States. (*Id*.).   It would be necessary for Liberty Mutual to locate and retrieve from storage each such closed file, which would require considerable additional time and expense.  (*Id*.).

As an additional matter, because the requested claims files concern claims by other policyholders, many of the files likely contain confidential and privileged information and documents, some of which could be subject to protective orders. (*Id*. at ¶ 13).  These files therefore would have to be reviewed by a team of legal personnel to determine whether the files contained confidential and privileged information that needed to be redacted. (*Id*.).  Further, for the files that are subject to protective orders, Liberty Mutual would need to acquire individual authorizations prior to production, necessitating further expenditure of time and money. (*Id*.).  Conservatively, it would require an average of 3 hours per file to complete this process. (*Id*.). The time and expense associated with this manual review does not include the considerable additional costs associated with locating and retrieving the files, transporting the files, and renting premises of sufficient size to conduct the review.  (*Id*.).

To provide the requested documents and information, then, Liberty Mutual would have to manually review, at a minimum, 102,997 different lawsuits, at an average of 30 minutes per lawsuit, to determine whether the lawsuit met the criteria specified in the Plaintiffs' discovery requests. (*Id*. at ¶ 7-14).  This would result in 51,499 man hours (almost 6 years of time). (*Id*.).  It would then take on average another 1 hour to locate and record the specific information for each lawsuit requested by the Plaintiffs. (*Id*.).  Assuming (very) conservatively that one-

half of the 102,997 different lawsuits alleged bad faith or some "other tortious conduct," this would take an additional 51,499 man hours (almost another 6 years of time). (*Id.*).  After Liberty Mutual was able to locate and pull the responsive claims files, many of which would be located in hundreds of different off-site storage facilities throughout the country, it would take an additional 3 hours on average to complete a review of each file for confidential and privileged information, which would most likely have to be completed by more expensive legal personnel. (*Id.*).  Assuming conservatively that each of the 51,499 responsive lawsuits only had a single claims file, this would take another 154,497 man hours (over 17 more years of time). (*Id.*). This manual review time does not take into account the considerable additional costs associated with locating and retrieving the files (many of which are in off-site storage), transporting the files, and renting premises of sufficient size to conduct the review and would not include Liberty Mutual's efforts to obtain information for the 2005 to 2007 period also requested by Graham.  (*Id.*).  These efforts would costs millions and millions of dollars.

Request No. 43 seeks the production of a complete list of all "claims" asserted against Liberty nationwide for bad faith and/or any other tortious conduct "in connection with Liberty's handling, processing, and adjusting of claims," ever.

Other than the efforts outlined above, Liberty Mutual has no way of identifying or producing a list of "claims" asserted against Liberty for bad faith

and/or other tortious conduct in connection with Liberty's handling, processing and adjusting of claims. (Exhibit 1, ¶ 15).  Liberty Mutual would be required to sift through <u>every</u> Liberty claims file to identify items complaining about the handling, processing, and adjusting of claims and then would have to make a subjective determination of which of these items constituted a "claim" for bad faith or some other unidentified tortious conduct, which would take considerably more time and expense than that outlined above. (*Id.*).

In Request No. 19 Graham seeks the production of <u>all correspondence</u> with <u>any State Department of Insurance and/or Commissioner</u> in any way involving alleged bad faith and/or any other tortious conduct in the adjustment and payment of any claim for <u>any commercial property claim</u> by Liberty <u>nationwide</u> <u>from 2005 to present</u>.

Liberty Mutual does not maintain correspondence with State Departments of Insurance and/or Commissioner of the criteria specified by the Plaintiffs' discovery requests. (Exhibit 1, ¶ 17).  In order to comply with the Plaintiffs' request for all correspondence with any State Department of Insurance and/or Commissioner involving bad faith and/or other tortious conduct in Liberty's adjustment and payment of claims for commercial property coverage since 2005, Liberty Mutual would have to identify all complaints filed with any State Department of Insurance since 2005 and then locate, pull, and review the files for each complaint in order to

determine which correspondence in those files meets the criteria specified by the Plaintiffs' discovery requests, which would take considerable time and expense. (*Id.*).

In *Marker v. Union Fidelity Life Insurance Company,* 125 F.R.D. 121 (M.D.N.C. 1989) the Middle District of North Carolina denied similar burdensome bad faith discovery where, as here, the insured made only conclusory allegations of bad faith and the insurer came forth with specific facts establishing the undue burden in responding to the bad faith discovery. The insured plaintiff sued for breach of contract and bad faith refusal to pay a claim on three separate group hospital indemnity insurance policies after the insurer defendant denied the insured's claim for coverage on elective surgery. *Id.* In the course of discovery, the insured requested that the insurer identify all lawsuits arising out of the termination of benefits and all claims made on similar policies relating to the elective procedure (less burdensome than that sought by Graham here). *Id.* After the insurer objected to production of these documents on grounds of relevance and undue burden, the insured moved to compel. *Id.*

The Court analyzed Rule 26 and noted that "one of the consequences of permitting liberal discovery is that the parties may engage in successive or abusive discovery." *Id.* at 124. In order to combat abusive discovery, courts should look to whether "discovery requests are sufficiently relevant as contrasted with the burden

of producing the information." *Id.* After reviewing these principles, the Court

denied the insured's motion to compel, holding as follows:

> Mere incantations that an opponent has acted in bad faith will not convert a simple contract lawsuit into a license to burden or harass one's adversary. Conclusory claims of bad faith may not be the bases for conducting marginally relevant discovery which is by its nature burdensome. Such discovery requests amount to nothing more than an out of season fishing expedition. Plaintiff has not made a prima facie or any other preliminary showing that defendant acted in bad faith, as a matter of policy, in order to discourage small claims or for some other reason.
>
> The slender showing of need by plaintiff stands in juxtaposition to the burden to defendant of producing the documents. Producing litigation histories very often is by its nature burdensome. Moreover, as recounted earlier, defendant has come forward with specific facts demonstrating the burden. Considering all of the above factors, the Court finds plaintiff's request to be excessive, unduly burdensome, and it shall be denied.

*Id.* at 125.

Just as in *Marker*, Graham has made no showing of bad faith on the part of

Liberty and its conclusory claims of bad faith in its complaint cannot serve as the

bases for conducting the burdensome and irrelevant discovery that it seeks.  When

Graham's purported "need" for the bad faith discovery is weighed against the

significant burden to Liberty in complying outlined above, it is clear that Graham's

requests should be denied.

Lastly, Graham's offer to "shoulder the burden" of the requested discovery

is an empty one.  Graham states in its Motion to Compel that it asks only that

Liberty provide the *responsive* hard claims and litigation files[6] for examination on Liberty's premises or in a searchable format on a portable hard drive. (Doc. 38, p. 10). Liberty is unsure how this shoulders any burden at all (or is even an offer to do anything at all really) as Liberty would still be required to go through the labor intensive steps outlined above to determine which files and documents are *responsive* to Graham's overreaching requests. Graham's offer to review the responsive documents (which presumably any party requesting discovery in any case would do) does nothing to relieve Liberty of the burdens associated with responding to Graham's bad faith discovery.

In sum, the burden and expense of responding to Graham's bad faith discovery would far outweigh any potential, unlikely benefit, and would impose an enormous undue burden on Liberty, such that Graham's Motion to Compel the bad faith discovery should be denied.

### C. The Requested Bad Faith Discovery Requests Also Implicate Serious Concerns about Privacy, Confidentiality, and Privilege

Graham's bad faith discovery requests also raise legitimate confidentiality and privacy concerns. There is private and protected information about Liberty's policyholders in the claims file and other documents that Graham has requested. Thus, in order to respond to Graham's requests, Liberty would have to disclose

---

[6] Now, Graham is apparently asking for not only detailed information about every lawsuit where Liberty has been sued for any tort and the claims files for those lawsuits, but also "litigation files" for each of those claims.

confidential information pertaining to people with absolutely no interest in the lawsuit or must undergo a thorough review of each file in order to remove and/or redact that information, which would only add to the already enormous costs of production. In addition, Liberty Mutual enters into protective orders governing the production of documents in many lawsuits where it has been sued (as in this one). Thus, many of the claims files are subject to protective orders of different courts, in different states, all over the country. In these cases, Liberty would need to obtain the other insureds' consent to release information and possibly even petition the courts before it could produce any of the documents that are subject to a protective order. Liberty would also have to review each file closely to identify and redact information that is protected by applicable privileges. These privacy concerns compound the burden Liberty faces if it is required to respond to Graham's bad faith discovery requests. *See Penford Corp v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 265 F.R.D. 430, 434 (N.D. Iowa 2009) (denying discovery related to claims made by third-parties and holding "[e]ven if claims made by the others are marginally relevant to the issues here, the Court believes that Defendants raise legitimate privacy concerns"); *St. Paul Reinsurance Co., Ltd.*, 197 F.R.D. at 644–45 ("[T]he [insurers] have identified substantial difficulties, even in the face of adequate record-keeping, that stand as impediments to discovery, <u>such as the necessity for the [insurers] to redact the materials in question to protect privileges</u>

and confidentiality rights that belong to others, and/or the necessity of obtaining confidentiality waivers, which is a matter not entirely within the [insurers'] control.") (emphasis added).

> **D.    Before Liberty Is Required to Undertake the Significant Time and Expense of Responding to Graham's Burdensome Bad Faith Discovery, Graham Should Establish that It Is Entitled to A Directed Verdict on Its Breach of Contract Claim.**

Numerous courts have found it appropriate to bifurcate bad faith claims and stay bad faith discovery in circumstances, as here, where the insured seeks costly and burdensome bad faith discovery. *See e.g., Garg v. State Auto. Mut. Ins. Co.*, 800 N.E. 2d 757, 763-64 (Ohio Ct. App. 2003) (reversing trial court's failure to bifurcate bad faith claim and stay related discovery because it was "grossly prejudicial" to the insurer); *Allstate Ins. Co. v. Melendez*, 550 So. 2d 156, 158 (Fla. 5th DCA 1989) (affirming trial court's bifurcation of bad faith claim in order to try coverage issues first); *Fode v. Farmers Ins. Exch.*, 719 P.2d 414, 417 (Mont. 1986) (holding that all issues involving bad faith were suspended "until the liability issues of the underlying case have been determined."). Even cases cited by Graham for the proposition that other claims information may be discoverable found it appropriate to bifurcate the contract and bad faith claims prior to allowing the discovery of other claims information to proceed. *See e.g., Grange Mut. Ins. Co. v. Trude*, 151 S.W.3d 803, 809 (Ky. 2004). Therefore, if this Court is inclined to allow any of the bad faith discovery sought by Graham, Liberty respectfully

requests that this Court bifurcate Graham's bad faith claim and stay Graham's bad faith discovery until after the merits of Graham's breach of contract claim have been decided on summary judgment. *See Baine v. General Motors Corp.*, 141 F.R.D. 332, 334 (M.D. Ala. 1991) (district court "has broad discretion" in controlling the timing and limitations of discovery); *Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936) ("[T]he power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants.").

To survive summary judgment on its bad faith claim, Graham "must show that [it] is entitled to a directed verdict on the contract claim and, thus, entitled to recover on the contract claim as a matter of law." *Lacey v. Allstate Indem. Co*., 2015 WL 875379, at *5 (N.D. Ala. Mar. 2, 2015) ("To show a prima facie case of the absence of an arguable reason to deny payment, 'the proof offered must show that the plaintiff is entitled to a directed verdict on the contract claim and, thus, entitled to recover on the contract claim as a matter of law.'"); *State Farm Fire & Cas. Co. v. Brechbill*, 144 So. 3d 248, 257 (Ala. 2013) (same). As a result, before Liberty is required to undertake the substantial time and expense of responding to Graham's burdensome bad faith discovery, Graham's bad faith claim should be put to this directed verdict on the contract test.

As noted above, it is difficult to imagine how Graham could ever establish that it is entitled to a directed verdict on the breach of contract claim where it seeks to reform the very contract that was allegedly breached in bad faith to provide coverage for its claim.   That is, how could there possibly be a bad faith breach where the contract, under the insured's own theory, did not provide coverage at the time the insured's claim was denied?   Similarly, to the extent Graham relies on the "errors and omissions clause" in the Liberty Policy, even Graham's own contorted reading of Liberty's coverage denial makes clear that Liberty's denial was based on a factual determination that went in Liberty's favor instead of Graham's such that a debatable reason for denying coverage existed.   Further, this factual determination is irrelevant when it comes to coverage, as the errors and omissions clause plainly excludes from coverage errors in the reporting of values, which is precisely what happened here.   Although Graham attempts to gloss over this important point in a footnote by calling it Liberty's "fall-back position," even if Cobbs Allen did intend to place equipment breakdown coverage with Liberty (again, a disputed fact precluding Graham's bad faith claim), there is still no coverage under the errors and omissions clause's plain and unambiguous terms because any error by Cobbs Allen was in the reporting of values.   While Graham— and Cobbs Allen and its malpractice insurer—may disagree that this carve-out language was meant to apply in these circumstances, this disagreement does not

give rise to a claim for bad faith.  Lastly, Liberty currently has a pending Motion for Partial Summary Judgment that could resolve most if not all of the issues in this lawsuit and calls into question whether Graham has impermissibly assigned its claim for bad faith that underpins the burdensome discovery sought in the Motion to Compel. (Doc. 26).

Therefore, if this Court is inclined to allow any of the requested bad faith discovery, Liberty submits the most prudent course is for the discovery to be stayed until after a ruling on Liberty's pending Motion for Partial Summary Judgment and after Graham's has established that it is entitled to a directed verdict on its claim for breach of contract.

### E.    If This Court Is Inclined to Allow Graham Any Bad Faith Discovery, Graham Should be Obligated to Pay for the Burdensome Discovery That It Seeks.

It is well-established that "courts have ample power under Rule 26(c) to protect respondent against undue burden or expense, either by restricting discovery or requiring that the discovering party pay costs." Fed. R. Civ. P. 34, Advisory Committee Notes.  It is generally recognized that in determining which party should bear the costs of production, "the likelihood of discovering critical information," "the amount in controversy as compared to total cost of production," "the importance of the requested discovery in resolving the issues at stake in the litigation," and "the relative benefits to the parties of obtaining the information"

should all be taken into consideration. *See Ex parte Cooper Tire & Rubber Co.*, 987 So. 2d 1090, 1106 (Ala. 2007) (reasoning that the less likely it is that a search will discovery critical information, the fairer it is to have the discovering party search at its own expense).

Each of these factors militates in favor of requiring Graham to bear the costs of production.  Graham's bad faith discovery seeks documents and information far beyond what could possibly be relevant to Graham's claims in this lawsuit and it is difficult to imagine how these documents and information could even be marginally beneficial to Graham or otherwise important to resolving the issues at stake in this lawsuit.  And, perhaps most importantly, the amount in controversy here pales in comparison to the likely costs of production.  Graham claims that the 550 Water Street loss amounts to $921,461. (Doc. 26).  After it was determined that Cobbs Allen neglected to procure insurance for this loss, Cobbs Allen and its malpractice insurer engaged an adjustor to determine the amount of the loss and, thereafter, agreed to pay Graham $751,685.56 for the loss to settle Graham's malpractice claims.  Thus, the amount in controversy in this lawsuit is somewhere between $0 and $169,775.  Using conservative estimates, the cost of responding to Graham's bad faith discovery could exceed <u>several *million* dollars</u>.[7]

---

[7] As noted above, excluding costs of locating, retrieving, and transporting files, Liberty Mutual estimates that it would take over 250,000 man hours to comply with Graham's bad faith discovery requests, many of which would need to be performed by legal personnel given the scope of the information requested and the privilege and confidentiality issues in play. (Exhibit 1, ¶ 17).  Even if Liberty Mutual could somehow

Accordingly, if this Court is inclined to allow Graham—a large commercial real estate firm with abundant resources—any of the bad faith discovery that it seeks, Graham should have to internalize the costs of production.  What better way to see if Graham is truly serious about its requests? *See Rowlin v. Ala. Dep't of Pub. Safety*, 200 F.R.D. 459, 462 (M.D. Ala. 2001) (noting that court may require discovering party to bear costs of production when party has sufficient resources to do so and "[b]y ordering the requesting party to internalize the reasonable costs of production, courts deter ambush attacks masquerading as discovery requests.").

## II.    Liberty's Adjustment of the Claim (Interrogatory Nos. 7, 12, 13, 19 and Requests 18, 36, and 37)

### A.    Interrogatory No. 7 (information related to the basis on which Liberty denied Graham's claim)

Interrogatory No. 7 seeks a description of information and data on which Liberty relied to make its claims decision.

Graham's inclusion of Interrogatory No. 7 in its Motion to Compel is confusing.  The Motion to Compel does not point to any deficiency in Liberty's response to Interrogatory No. 7 and otherwise contains no discussion of what additional information Graham seeks.  This is likely because Liberty fully and adequately responded to the interrogatory under Rule 33(d) by referring Graham to relevant portions of the claims file that has been produced, namely Liberty's July

---

have this work performed at $75 per hour, which is extremely conservative, the total cost of responding to the requested discovery could approach $20,000,000.

15, 2014 and July 31, 2014 correspondence generally setting forth Liberty's coverage position.  In its Rule 37 letter, Graham objected to Liberty's response on the basis that Liberty did not identify specific bates ranges for the cited documents, despite the fact that Graham's own responses to Liberty's first-served interrogatories contained much less detail and similarly did not identify bates ranges for the documents Graham cited under Rule 33(d). (Doc. 38-2).  In any event, in a good faith effort to resolve any dispute, _before the agreed upon date for Liberty to respond to Graham's Rule 37 letter and the day after Graham prematurely filed this Motion to Compel_, Liberty supplemented its response to Interrogatory No. 7 to identify the specific bates ranges the identified coverage letters and claims notes as Graham requested. (_See_ Exhibit 2, September 1, 2015 Letter, p. 2).  Liberty regrets that Graham has wasted this Court's (and Liberty's) time with respect to its premature motion to compel this request.

**B.    Interrogatory Nos. 12 and 13 and Requests 36 and 37 (coverage opinions and legal advice)**

Graham's inclusion of Interrogatory Nos. 12 and 13 and Requests 36 and 37 in its Motion to Compel is similarly confusing.  These requests seek detailed information about any coverage opinions for Graham's claim that were provided by any in-house or outside attorney and the production of those opinions and supporting legal authorities.

Graham's <u>only</u> argument in support of discovering these materials is that an insured may discover coverage opinions where the insurer asserts an advice of counsel defense.  The problem is that <u>Liberty has **never** asserted advice of counsel as a defense in this case, in its answers or otherwise</u>. (*See* Docs. 11 and 24). *See Pearson v. Travelers Home & Marine Ins. Co*., No. 4:11-cv-1846-JHE, 2014 WL 1329528, at *2 (N.D. Ala. Mar. 31, 2014) (holding that coverage opinions are not discoverable where "defendant had not asserted an 'advice of counsel' defense"); *Ex parte Great Am. Surplus Lines Ins. Co.*, 530 So. 2d 1357, 1358 (Ala. 1989) (coverage opinions "represent a communication from the attorney to the client, and that it is, therefore a privileged communication. Any further discussion of this issue is unnecessary.").  Further, had Graham waited to file its Motion to Compel on these requests until <u>after the agreed upon extension for Liberty's response to Graham's Rule 37 letter</u>, it would have seen that Liberty once again reaffirmed that it was not claiming advice of counsel as a defense and this entire argument could have been avoided. (*See* Exhibit 2, p. 2).  Liberty regrets that Graham has wasted this Court's (and Liberty's) time with respect to its premature motion to compel this request.

**C.    Request 18 (all claims files handled by Dwight Hinton since 2005 on any commercial property policy)**

Request 18 seeks <u>all claims files</u> handled by Dwight Hinton <u>nationwide</u> <u>from 2005 to present</u> that involved <u>any claim for commercial property insurance coverage</u>, that is, every claim that Dwight Hinton has ever handled.

Graham's attempts to compel these documents should be denied for all of the same reasons stated above in connection with Graham's bad faith discovery. Other claims files for other insureds involving other circumstances in other states under other types of policies from a previous decade simply have no bearing on Graham's claims in this lawsuit.   Again, Graham cites no law supporting its entitlement to such broad and unfettered discovery, and does not even attempt to articulate how these other files would be relevant to its claims here.

Further, and as noted more fully above, even if these other claims files were somehow relevant to Graham's claims in this lawsuit (they are not), the burden on Liberty far outweighs any potential benefit to Graham. (Exhibit 1, ¶ 16).

**D.    Interrogatory 19 (reserve information)**

Interrogatory 19 seeks detailed information on any reserve set by Liberty in connection with Graham's claim.

Graham seems to confuse third-party liability cases and first-party property cases in arguing that reserve information is discoverable.  Indeed, most of the cases cited by Graham found that reserve information was discoverable to establish how

the insurer evaluated the underlying third-party tort liability claim in connection with a claim for bad faith failure to settle within policy limits.

The general rule in first-party insurance cases, however, is that reserve information is not discoverable. *See Safeguard Lighting Sys., Inc. v. N. Am. Specialty Ins. Co.*, No. Civ.A.03-4145, 2004 WL 3037947, *3 (E.D. Pa. Dec. 30, 2004) (denying motion to compel reserves information and stating "[a]s this court has stated on previous occasions, there is a tenuous link between reserves and actual liability given that numerous considerations factor into the calculation of reserves..."); Ann F. Ketchen, *Reserve and Reinsurance Information: Is It Discoverable?*, 38-SPG Brief 40 (2009) ("The majority rule in first-party claims is that reserve information is outside the scope of discovery because the information is not relevant as to what an insurer thought the merits of a claim...") (emphasis added). As indicated in these decisions, any reserves set by Liberty in connection with Graham's first-party claim would have no bearing on Liberty's coverage decision at all and therefore would not be relevant to Graham's claims in this lawsuit.

III. **Personnel Files, Performance Goals, Claims Department Evaluations, Third-Party Contracts and Corporate Values (Request Nos. 20-24, 31, and 42)**

   A. **Request Nos. 20-24 (performance goals, claims department evaluations, personnel files)**

These requests seek a myriad of information relating to Liberty's claims department performance goals and evaluations for <u>all claims personnel</u> <u>from 2005 to present</u> and the production of complete personnel files and related performance evaluation documentation for <u>every person</u> involved <u>in any aspect</u> of Graham's claim <u>from 2005 to present</u>.

Graham relies on cases from South Dakota and Oklahoma to supports its argument on production. Alabama cases, however, recognize a strong public policy against the discovery of this type information and have uniformly rejected similar discovery absent a very specific showing. *See Coker v. Duke & Co, Inc.*, 177 F.R.D. 682, 685 (M.D. Ala. 1998) (denying motion to compel personnel files and materials and stating the defendant "correctly notes that there is a strong public policy against the discovery of personnel files."); *McBride v. Houston Cnty. Health Care Auth.*, 2014 WL 4599020, at *1 (M.D. Ala. Sept. 15, 2014) (noting that "there is a strong public policy against discovery of personnel files."); *Britt v. U S A Truck, Inc.*, No. CIVA2:06-CV-868-ID, 2007 WL 4395578, at *2 (M.D. Ala. Dec. 11, 2007).

Indeed, given the strong Alabama public policy against discovery of personnel materials, Alabama courts recognize that discovery of such materials "is permissible <u>only</u> if (1) the material sought is clearly relevant and (2) the need for discovery is compelling because the information sought is not otherwise readily

obtainable." *Coker,* 177 F.R.D. at 685 (emphasis added).   In *Coker*, the Middle District of Alabama denied the plaintiff's motion to compel personnel materials because the plaintiff had made only a general showing of relevance and no showing at all as to why the personnel materials were not available from other sources. *Id.*   Similarly, in *McBride*, the Middle District of Alabama denied the plaintiff's motion to compel personnel materials because the plaintiff could not satisfy the second prong by showing that potentially relevant information sought was not available by less invasive means, such as at deposition or through narrowly tailored interrogatories. *McBride*, 2014 WL 4599020, at *1.   Thus, to compel discovery of the requested personnel materials here, Graham must make a showing that the materials sought are clearly relevant with more than mere generalities and that the need for the discovery is compelling because the information sought is not otherwise readily obtainable through less invasive means. *See id*.

Graham has not come close to making this showing.   As for the first prong, Graham only provides generalities and conclusory statements for its overly broad requests about the supposed relevance of the requested information and has wholly failed to tie the requested information to any of the factual allegations in this lawsuit.   Boiled down, Graham's relevancy argument is that the requested personnel files might show that Liberty paid its employees bonuses for denying

valid claims.  As for the second prong, Graham does not even attempt address why the requested personnel materials are not available from other sources or obtainable through less invasive means, such as through narrowly targeted interrogatories or at deposition.

Lastly, in addition to failing to make this two prong showing, the burden and expense of responding to these requests would far outweigh any potential, unlikely benefit, and would impose an undue burden on Liberty.

Graham has requested, among other things, all performance evaluation report and reviews "that evaluate the claims department and its personnel for the years 2005 to present" and, all document concerning job performance reviews for each person "who has ever reviewed or evaluated any aspect of [Graham's] claim." To respond to the Graham's request for this information, Liberty Mutual would have to run a report for all personnel that have worked in the claims department for Liberty Mutual since 2005, which would encompass thousands of people. (Exhibit 1, ¶ 18). Liberty Mutual would then have to request human resources to pull the individual files for each personnel member that worked in the claims department since 2005 and review the files to locate and pull the responsive personnel information. (*Id*.).   Given privacy concerns, once this was complete, Liberty Mutual would have to have legal personnel review the responsive information to

determine whether it contained confidential and privileged information that needed to be redacted, which would take considerable additional time and expense. (*Id.*).

For all of these reasons, Graham's Motion to Compel these personnel materials should be denied.

### B.     Request No. 31 (third-party contracts)

Request No. 31 seeks the production of contracts between Liberty and third-parties involved in the investigation or handling of Graham's claim.

Before the agreed upon date for Liberty to respond to Graham's Rule 37 letter and the day after Graham prematurely filed this Motion to Compel, Liberty supplemented its response to Request No. 31 to provide that it would produce non-privileged responsive documents at a mutually agreeable time when Graham supplemented its responses to Liberty's first-filed discovery. (*See* Exhibit 2, p. 5). Liberty regrets that Graham has wasted this Court's (and Liberty's) time with respect to its premature motion to compel this request.

### C.     Request No. 42 (corporate values)

Request No. 42 seeks all documents that relate to corporate values adopted by Liberty as it relates to the treatment of its insureds.

Liberty is unsure what this even means, and Graham has not attempted to articulate what information it is seeking, much less how this information would be relevant to it claims.  Not surprisingly, corporate values are not even discussed in

Graham's Motion to Compel other than Graham's quoting the request.  In an effort
to comply with this request, Liberty notes that the following creed is located on the
wall as you enter its head office in Boston:

> With our policyholders we are engaged in a great mutual enterprise. It
> is great because it seeks to prevent crippling injuries and death by
> removing the causes of home, highway, and work accidents. It is great
> because it deals in the relief of pain and sorrow and fear and loss. It is
> great because it works to preserve and protect the things people earn
> and build and own and cherish. Its true greatness will be measured by
> our power to help people live safer, more secure lives.

## IV.  Quality Assurance Manuals and Resolution Unit Guidelines (Request Nos. 27 and 29)

### A.    Request No. 27 (quality assurance manuals)

Request No. 27 seeks the production of all quality assurance manuals and all
other documents and communications that contain information about Liberty's
claims handling practices.

Graham provides no legal basis for the discoverability of the requested
quality assurance information and does not even discuss quality assurance
information in its argument.  Instead, every case cited by Graham relates to the
discoverability of claims manuals and training materials, relevant versions of
which Liberty has already agreed to produce.  The quality assurance information is
not discoverable and Graham's request to compel this discovery should be denied.

**B.      Request No. 29 (resolution unit documents)**

Request No. 29 seeks the production of a myriad of information related to "the resolution unit that was in place at the time of the adjustment of [Graham's] claim."

Graham objected to this request on the ground that it was, among other things, vague and ambiguous. And, _before the agreed upon date for Liberty to respond to Graham's Rule 37 letter and the day after Graham prematurely filed this Motion to Compel_, Liberty informed Graham that there was no "resolution unit" in place at the time of the adjustment of Graham's claim such that no responsive documents exist other than the claims handling materials that Liberty had already agreed to produce. (_See_ Exhibit 2, p. 5).  Liberty regrets that Graham has wasted this Court's (and Liberty's) time with respect to its premature motion to compel this request.

**V.    Other Claims Files, Lawsuits, and Information Involving the Errors and Omissions Clause (Interrogatories 10 and 11 and Requests 45-47)**

**A.      Interrogatory Nos. 10 and 11 and Request No. 47 (other claims files and lawsuit involving errors and omissions clause)**

Interrogatory Nos. 10 and 11 seek detailed information about every instance in which Liberty (companywide) has handled or litigated a claim under a similar errors and omissions clause nationwide from 2005 to present.

Requests No. 47 seeks the production of <u>all claims files</u> identified in response to Nos. 10 and 11.

Graham's attempts to compel these documents and information should be denied for all of the same reasons stated above in connection with Graham's bad faith discovery. Other claims files for other insureds involving other facts in other states under other types of policies from a previous decade simply have no bearing on Graham's claims in this lawsuit.  Again, Graham cites no law supporting its entitlement to such overly broad and unfettered discovery, and provides nothing more than conclusory statements as to how these other files would be relevant to its claims here

Further, and as noted more fully above, even if these other claims files were somehow relevant to Graham's claims in this lawsuit (they are not), the burden on Liberty far outweighs any potential benefit to Graham. (Exhibit 1, ¶¶ 7-14).

Lastly, although Liberty Mutual does not maintain a central filing system or location designated for lawsuits and claims files involving the errors and omissions clause at issue, Liberty Mutual has inquired into whether Liberty has handled any equipment breakdown claims involving the subject errors and omissions clause and has been unable to locate any such claim. (*Id.* at ¶ 19).

**B.     Request Nos. 45 and 46 (modifications to errors and omissions clause and document reflecting underwriting intent)**

Request No. 45 seeks all revisions adopted for Liberty equipment breakdown policies which modify and/or amend the errors and omissions clause, and Request No. 46 seeks all documents that "in any way reference, relate to or reflect" the underwriting intent of the clause.

In its response to these requests, Liberty informed Graham that the Liberty Policy is an ISO form that was created and is revised by ISO, not Liberty. Accordingly, Liberty would not have "adopted" any revisions to the errors and omissions clause and would have no underwriting intent such that no responsive documents exist.  Additionally, before the agreed upon date for Liberty to respond to Graham's Rule 37 letter challenging this response and the day after Graham prematurely filed this Motion to Compel, Liberty again informed Graham that the Liberty Policy is an ISO form and that Liberty was not aware of any responsive documents.  Although Graham has not once attempted to articulate exactly what information it seeks or how these requests would be applicable to an ISO form, Liberty agreed to continue its search and supplement its production if anything was found. (*See* Exhibit 2, p. 6).  Liberty stands willing to confer in good faith as to exactly what Graham seeks in these requests, and regrets that Graham has wasted this Court's (and Liberty's) time with respect to its premature motion to compel.

**VI.   Liberty Is Entitled To Attorney's Fees If The Court Denies Graham's Motion.**

Under Rule 37(a)(5)(B), when a motion to compel is denied, the Court "must … require the movant, the attorney filing the motion, or both to pay the party or deponent who opposed the motion its reasonable expenses incurred in opposing the motion, including attorney's fees" unless the motion to compel "was substantially justified or other circumstances make an award of expenses unjust." Fed. R. Civ. P. 37(a)(5)(B).  Based upon the arguments herein, Liberty submits that Graham's Motion to Compel was not substantially justified and that no other circumstances exist that would make an award of fees unjust.  Liberty therefore requests respectfully that this Court deny Graham's Motion to Compel and award Liberty its reasonable expenses and fees incurred in filing this opposition.

<u>CONCLUSION</u>

For the reasons set forth herein, Graham's Motion to Compel is due to be denied, and Liberty is entitled to a protective order and reasonable expenses and fees incurred in filing this opposition.

Respectfully submitted this 28th day of September, 2015,

Joshua B. Baker (asb-5105-s72b)
Jeffrey M. Grantham (asb-4866-m66j)
Joshua R. Hess (asb-8080-m29c)
*Attorneys for Liberty Mutual Fire Insurance Company*

**MAYNARD, COOPER & GALE, P.C.**
1901 Sixth Avenue North
2400 Regions/Harbert Plaza
Birmingham, AL 35203-2618
Telephone: (205) 254-1000
Facsimile: (205) 254-1999
jbaker@maynardcooper.com
jgrantham@maynardccooper.com
jhess@maynardcooper.com

## CERTIFICATE OF SERVICE

I hereby certify that on this 28th day of September, 2015, I served a copy of the foregoing on all parties and/or counsel of record by using the CM/ECF system and/or U.S. Mail, postage prepaid and properly addressed, as follows:

Justin T. McDonald
Bradley Arant Boult Cummings, LLP
One Federal Place
1819 Fifth Avenue North
Birmingham, AL 35203-2119
Phone: (205) 521-8515
Fax: (205) 488-6515
jmcdonald@babc.com

Alex Purvis
Kate Margolis
Bradley Arant Boult Cummings, LLP
188 E. Capitol St., Ste. 450
P.O. Box 1789
Jackson, Mississippi 39215-1789
Phone: (601) 948-8000
Fax: (601) 948-3000
apurvis@babc.com
kmargolis@babc.com

Stephen E. Whitehead
Graham R. Pulvere
Carleton "Put" Ketcham, III
Lloyd, Gray, Whitehead & Monroe, P.C.
2501 Twentieth Place South, Ste. 300
Birmingham, Alabama 35223-1745
Telephone: (205) 967-8822
Fax: (205) 967-2380
steve@lgwmlaw.com
gpulvere@lgwmlaw.com
pketcham@lgwmlaw.com

**OF COUNSEL**